**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------X
                               :
JOYCE B. AYERS,                :
                               :
            Plaintiff,         :
                               :
    -against-                  :    <u>REPORT AND RECOMMENDATION</u>
                               :    05 Civ. 5902 (CLB)(MDF)
JOHN POTTER, Post Master       :
General, Agency,               :
                               :
            Defendant.         :
                               :
------------------------------X

**TO: THE HONORABLE CHARLES L. BRIEANT, U.S.D.J.**

*Pro se* plaintiff Joyce B. Ayers ("Ayers"), an employee with the United States Postal Service ("USPS"), brings this action against the USPS claiming violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* as amended by the Civil Rights Act of 1991 ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA"), the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), and the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.* Ayers alleges that the USPS failed to accommodate her disability and/or terminated her employment on account of her race (African American), age (56), and disability (spinal condition), and in retaliation for her prior invocation of the Equal Employment Opportunity ("EEO") process. Currently pending is the USPS's motion to dismiss, pursuant to Rule 12(b)(1) and (6) of the

1

Federal Rules of Civil Procedure, or, alternatively, for summary judgment under Rule 56.  The USPS asserts, *inter alia*, that Ayers's Title VII, ADEA, and Rehabilitation Act claims should be dismissed due to her failure to exhaust administrative remedies and that this Court lacks subject matter jurisdiction over her ADA claim.  For the reasons that follow, I respectfully recommend that your Honor grant the USPS's motion to dismiss pursuant to Rule 12 and dismiss the complaint in its entirety.

### BACKGROUND

The following facts are undisputed, unless otherwise noted, and taken in the light most favorable to Ayers, the non-moving party.

### I.        Ayers's Employment with USPS

In 1987, Ayers began working for the USPS and, in the early 1990's, she suffered work-related injuries, which resulted in a permanent partial disability.  *See* Declaration of Fani Miller-Beard ("Miller-Beard Decl.") at ¶ 3; Transcript of Deposition of Joyce B. Ayers (attached as Ex. to the Declaration of Joseph A. Pantoja ("Pantoja Decl."))("Ayers Tr.") at 7-9.  Ayers was subsequently approved by the Office of Workers' Compensation Programs, United States Department of Labor ("OWCP"), for compensation benefits in connection with the job related injuries she had sustained.  *See* Miller-Beard Decl. at ¶ 3.  When Ayers returned to work at the USPS in 1993, she began working in a

limited capacity as a Level 4 Modified Mark-Up Clerk with certain physical restrictions as determined by her doctors, OWCP, and the USPS.  *See id.*; Ayers Tr. at 9-13, 224.  According to the affidavit of Fani Miller-Beard, Manager of Injury Compensation with the USPS, Westchester District, when approved by the OWCP, injured employees may be offered modified work assignments in accordance with submitted medical opinion as to their ability to perform the limited duty job and the availability of such positions.  *See* Miller-Beard Decl. at ¶ 6.

From 1996 until March 26, 2001, Ayers worked, pursuant to a rehabilitation job offer, at the 1000 Westchester Avenue USPS location in White Plains, New York (the "Westchester facility"), as a limited-duty Level 4 Data Clerk in the expedited services offices.  *See id.* at ¶ 4, Ex. 1; Ayers Tr. at 13, 17-18. According to Miller-Beard, Ayers's assignment to this position was dependent on the availability of suitable work after taking into account the operational needs of the office at the time. *See* Miller-Beard Decl. at ¶ 5.

Due to operational changes and new equipment availability in 2000 there was insufficient work for Ayers at the Westchester facility expedited services unit and the position she held was eliminated.  *See id.* at ¶¶ 6-8.  In November 2000, Miller-Beard found other suitable work for Ayers and, pursuant to a new written job offer detail sheet, offered Ayers a modified position

as a Level 4 Automated Mark Up Clerk in the Computer Forwarding Unit ("CFU") located in the same facility as her previous position.  *See id*. at ¶ 8, Ex. 4.  The effective date of the offer was December 2, 2000, but the start date was deferred, as Ayers had challenged the suitability of the job to the OWCP.  *See id*. at ¶ 9.  On March 5, 2001, the OWCP responded that the CFU job was suitable within the limits of Ayers's medical restrictions that were on file.  *See id* at ¶ 9, Ex. 5.  On March 26, 2001 and after an ergonomic review of the work site, Ayers began work at in the CFU.  *See id*. at ¶¶ 11-12.

The day after she started in the CFU position, Ayers raised a series of objections to the position, including allegations of hostility by other employees.  *See id*. at ¶ 12.  She complained about being re-assigned to the same area in which she had had a physical altercation with another employee, Cassandra Coy, in 1993.  *See id.*  Ms. Coy however was no longer working in that unit.  *See id*.

Ayers also complained that the work was unsuitable and causing her injury.  *See id*. at ¶ 13.  By letter dated April 2, 2001, Miller-Beard informed Ayers that her doctors would need to document her inability to perform the job in CFU and provided her with the necessary medical restriction forms.  *See id*. at ¶ 13, Ex. 9.  Due to her complaint of injury and in accordance with standard USPS practice, Lisa Barron, CFU Manager, directed Ayers

4

to cease work until the medical documentation was received and a determination could be made as to the availability of work, if any, that Ayers could perform.  *See id*. at ¶ 14, Ex. 10.

On April 19, 2001, Miller-Beard received a note from Dr. Robin Herbert, indicating that Ayers had been under her care since March 28, 2001.  *See id*. at ¶ 15, Ex. 11.  The note did not reference any date of injury or claim number.  On April 30, 2001, Miller-Beard received a completed form OWCP-5 form from Dr. Herbert, recommending that Ayers be re-assigned to her previous position in the expedited services unit and stating that she was unable to work in her current job.  *See id*. at ¶ 16, Ex. 12. Miller-Beard wrote to Dr. Herbert, informing her that Ayers's previous job in the expedited services unit no longer existed and stating her belief that, therefore, based on Dr. Herbert's findings, Ayers could not return to work.  *See id*. at  ¶ 17, Ex. 13.  Dr. Herbert responded with a short note indicating that Ayers could return to work on May 21, 2001.  *See id*. at     ¶ 18, Ex. 14.  The note did not indicate to what assignment Dr. Herbert referred.

On May 30, 2001, Miller-Beard wrote to Ayers advising her that she needed to confirm her leave status with her supervisor and that she had to provide current medical documentation on a monthly basis if she continued to be disabled from work.  *See id*. at ¶ 19, Ex. 15.  By letter dated July 30, 2001, Miller-Beard

informed Ayers that she had not yet received any medical documentation to support her total disability status and that, because she had failed to return to work or provide the necessary documentation, her absence would be charged as absent without leave. *See id*. at ¶ 20, Ex. 16.  On August 14, 2001, Ayers gave Miller-Beard a Form CA-20 completed by Dr. Herbert and stating, "Pt. can only return with restrictions previously noted." *See id*. at ¶ 22, Ex. 17.  Miller-Beard gave Ayers an OWCP-5 work restriction form and told her that her doctor would need to clarify her restrictions. *See id*. at ¶ 22.

Despite being told that her medical documentation was insufficient, Ayers reported to work in the CFU unit on August 15, 2001. *See id*. at ¶ 23.  On that day, Miller-Beard wrote to Dr. Herbert asking her to address certain deficiencies in the last form she had submitted. *See id*. at ¶ 24, Ex. 18.

Ayers again reported to work on September 5, 2001, but not to do the work she had been assigned in the CFU. *See id*. at ¶ 25; Ayers Tr. at 241-42.  Stanley Piasta, Manager of Labor Relations, directed Ayers to go home because he had not yet discussed the issue with Miller-Beard. *See* Miller-Beard Decl. at ¶ 25, Ex. 19, Ayers Tr. at 242-43.

On October 5, 2001, Ayers wrote a letter to Miller-Beard, in which she complained that Piasta's decision to send her home on September 5, 2001 was discriminatory and caused her emotional

and physical injury.  *See* Miller-Beard Decl. at ¶ 26, Ex. 20.
Ayers requested Miller-Beard's authorization for medical
treatment for the alleged injuries.  *See id*.

By letter dated December 12, 2001, Ayers was informed that
her position in the CFU would be abolished effective March 16,
2002 because the CFU was being moved to the Kingston USPS office.
*See id*. at ¶ 27, Ex. 21.  The letter advised Ayers that she would
be "designated as an unencumbered full-time employee until such
time as you successfully bid for a position or are involuntarily
reassigned to a residual vacancy."  *Id*.  On April 15, 2002,
Thomas DiMargo, Manager of Delivery Services, informed Ayers that
she was being reassigned to the Westchester facility, but that
she must await receipt of a new job offer from the USPS.  *See id*.
at ¶ 28, Ex. 22; Ayers Tr. at 254-55.

In September 2002, Dr. John S. Mazella conducted a second
opinion medical examination and concluded that Ayers could work
so long as the job did not require her to engage in prolonged
work with her arms extended in front of her, Ayers was offered a
new job as a Level 5 modified Mail Processing Clerk at the
Westchester facility.  *See* Miller-Beard Decl. at ¶¶ 29-30, Exs.
23-25.  In her offer letter, Miller-Beard advised Ayers that she
had ten days to accept or reject the job offer using the enclosed
"Job Offer Sign-Off Sheet," which Ayers and her doctor were
required to sign.  *See id*.  Ayers returned the sign-off sheet,

but conditioned her acceptance of the position with 14 handwritten lines, in which she demanded training and ergonomic review, expressed her belief that the job offer was not made in good faith, and questioned whether the OWCP had considered her current medical restrictions. *See id*. at Ex. 26. Ayers also stated that she did not have sufficient information about the job description to present it to her physician for an evaluation. *See id.* The form was not signed by the physician as required, was not dated, and did not clearly state whether Ayers intended to accept the job offer. Miller-Beard, therefore, did not construe Ayers's submission of the form as an acceptance of the offer. *See id*. at ¶ 31.

In a letter dated October 7, 2002 to Hugh McCauley, the Manager of in-Plant Support, Ayers reiterated her conditional acceptance of the job offer and also, for the first time, requested a light duty assignment. *See id*. at ¶ 32, Ex. 27. On February 5, 2003, McCauley denied Ayers's request for light duty work, advising her that the Medical Unit did not have any current medical documentation to support such an assignment. *See id*. at ¶ 37, Ex. 33.

Also on October 7, 2002, Ayers wrote to Miller-Beard requesting copies of all documents considered by the USPS and OWCP in making the September 2002 job offer. *See id*. at ¶ 33, Ex. 28. On October 8, 2002, Dr. Herbert informed Miller-Beard

8

that she was unable to sign off on the September 2002 job offer and repeated her request that Ayers be reassigned to her position in the expedited services office. *See id.* at ¶ 36, Ex. 32.

In a letter dated April 1, 2003, Dr. Herbert again stated that she could not approve the September 2002 job offer and reiterated that Ayers should be reassigned to the previously requested position, despite having been previously advised that the job no longer in existed. *See id.* at ¶ 38, Ex. 34. Miller-Beard took this letter to mean that Dr. Herbert was of the opinion that Ayers could not perform the job duties in the most recent job offer. *See id.* Dr. Herbert again reiterated this opinion in a letter to Miller-Beard dated August 5, 2003. *See id* at ¶ 40, Ex. 36.

On September 5, 2003, Ayers was offered a new modified assignment at the Westchester facility effective September 27, 2003. *See id.* at ¶ 41, Ex. 37. Ayers rejected the offer and did not report for work. *See id.* at ¶ 43. Instead, she requested extensions due to a conflict she had in connection with a substitute teaching job in the Mount Vernon school district, all of which were granted by Miller-Beard. *See id.*

On December 3, 2003, Ayers reported to work pursuant to the September 2003 job offer. *See id.* at ¶ 44; Ayers Tr. at 302-03. Ayers signed the acceptance form that day, but indicated on the form that her acceptance was conditioned on an ergonomic

evaluation of her work station.  *See* Miller-Beard Decl. at ¶ 44,
Ex. 39.  Miller-Beard construed this as a conditional acceptance
and advised McCauley, Ayers's supervisor in the new position, to
direct Ayers to stop working and inform her that she could not
return to work until the USPS and Department of Labor reevaluated
the job offer.  *See id*. at ¶ 44, Ex. 40.  Later on that day,
however, Ayers went to Miller-Beard's office and stated that she
did not intend to condition her acceptance of the offered
position on the ergonomic evaluation.  *See id*. at ¶ 45.
Accordingly, Miller-Beard deemed that Ayers had accepted the
position, allowed her to resume work immediately, and informed
her that she would be paid for the day.  *See id*.; Ayers Tr. at
304-10.

Ayers then continued to work without incident until March
12, 2004 when, in her capacity as a union shop steward, she met
with Maintenance Supervisor Michael Annechino because she needed
to have him sign a union form on behalf of another employee.  *See*
Miller-Beard Decl. at ¶ 47, Compl. at ¶ 8; Ayers Tr. at 315-18
(stating that, after December 3, 2003, she "was performing [her]
duties without any problems" and that she "was allowed to have
[her] stretch breaks or whatever [she] needed," she "could break
as often as [she] wanted," and that she "didn't have the same
problems").  According to Ayers, after she refused to allow him
to have a copy of the form he had signed, he attempted to

"wrestle the papers from [her]."  Ayers Tr. at 318.

Ayers' complaint was investigated by the Postal Inspection Service that day.  *See* Pantoja Decl. at Ex. 3.  Ayers also filed a union grievance in connection with the incident.  *See* Defendant's Local Rule 56.1 Statement at ¶ 105.  By letter dated April 27, 2004, the OWCP accepted Ayers's claims for a neck/back sprain and right shoulder sprain.  *See* Miller-Beard Decl. at ¶ 48, Ex. 40.  Ayers has not worked since.  *See id.*

In a letter dated July 19, 2004, Dr. Alain De La Chapelle, a psychiatrist, reported that Ayers was not competent to work at that time due to anxiety and other reasons.  *See id.* at ¶ 49, Ex. 42.  This evaluation served as the basis for Ayers's complaint of post-traumatic stress disorder, which was accepted by the OWCP on September 22, 2004.  *See id.* at ¶ 50.  On August 29, 2006, Dr. Herbert submitted documentation to the OWCP opining that Ayers was not able to perform the duties of the position she had held from December 3, 2003 until March 12, 2004.  *See id.* at ¶ 51, Ex. 44.  Dr. Herbert then went on to state her position that Ayers would be able to return to the job she held prior to her March 26, 2001 transfer, despite the fact that that job, as previously noted, no longer existed.  *See id.*

## II.   **Ayers's EEO Complaints**

On February 26, 2004, Ayers requested an appointment with a Dispute Resolution Specialist in the USPS EEO Office.  *See* Compl.

11

at attachment 2.  As developed in counseling, Ayers's alleged

that: (1) on April 16, 2001, she was "summarily dismissed [her]

from work due to the fact that the supervisors in the CFS unit

assigned [her] work outside of [her] work restrictions as

prescribed by [her] private physician"; (2) she was not provided

with work for almost three years despite having complied with all

medical requests; and (3) on December 3, 2003, McCauley

discharged her from work.  *Id*.  On August 25, 2004, Ayers

received the EEO's notice of her right to file a formal EEO

complaint.  *See id*. at attachment 3; Pantoja Decl. at Ex. 5

(Record of Delivery).  On November 26, 2004, Ayers filed an

individual EEO complaint, alleging,

> Agents of U.S. Postal Service named above [Hugh
> McCauley, Michael Annechino, Lisa Barron, Fani Miller-
> Beard, Thomas DiMargo, and Stanley Piasta]
> participated at various times in denying me work
> and/or perpetrated an environment that was hostile and
> unsafe. Resulting in allowing physical assaults
> against me on three separate occasions, causing me
> physical and emotional harm as well as economic and
> mental debilitation and stress.  These acts occurred
> continuously.

Compl. at attachment 3.  During her deposition, Ayers explained

that the three assaults to which she referred in her EEO

complaint were: (1) an alleged assault by former supervisor

Cassandra Coy in 1991, *see* Ayers Tr. at 9, 39-40, 318-19; (2) an

alleged assault by a male maintenance supervisor in 1997 or 1998

that involved the supervisor trying to close a door on her while

she was still talking to him on behalf of another employee in her

capacity as a union shop steward, *see id*. at 321-23; and (3) the alleged assault by Annechino, *see id*. at 315-18.

On February 25, 2005, the USPS issued its Final Agency Decision denying Ayers's claims. *See* Compl. at first attachment. The USPS denied the claims on the ground that they were not timely filed, failed to state a claim, or were otherwise moot. *See id*.

Ayers filed the complaint in this case in May 2005. *See* Compl. She alleged the following facts:

> Beginning in March of 2001, and continuing to date, the U.S. Postal Service through its agents[] caused me physical, emotional, mental and economic hardships by summarily dismissing me from work, ignoring all medical documents, refusing to honor my medical restrictions for about (3) years; allowing [and] tolerating a hostile and violent environment (I was physically assaulted for the 3rd time on March 12, 2004 by a supervisor); retaliating due to my EEO activities and USPS engaged in constructive discharge.

*Id*. at 4.

## ANALYSIS

### I.      Rule 12

When considering a motion pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), a court is required to accept the material facts alleged in the complaint as true, and not to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir.

1994) (citation and quotation omitted) (Rule 12(b)(6)); *Shipping Financial Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) (Rule 12(b)(1)).  "Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  For dismissals under Rule 12(b)(6), the task of a court "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Cooper*, 140 F.3d at 440.  As always, "[w]here the non-moving party is proceeding *pro se*, the court must interpret that party's supporting papers liberally, that is, interpret them "to raise the strongest arguments that they suggest." *Forsyth v. Fed'n Employment and Guidance Svc.*, 409 F.3d 565, 569 (2d Cir. 2005).  Finally, because the USPS moved in the alternative for summary judgment and provided Ayers with the requisite notice pursuant to Local Rules 12.1 and 56.2, consideration of matters outside the pleadings is appropriate.

II.      **Exhaustion of Administrative Remedies**

Before commencing an action in federal court under Title

VII, the ADEA, and the Rehabilitation Act, a plaintiff must timely exhaust his administrative remedies. *See Boos v. Runyon*, 201 F.3d 178, 181 (2d Cir. 2000)(Rehabilitation Act); *Briones v. Runyon*, 101 F.3d 287, 289 (2d Cir. 1996)(Title VII); *Wrenn v. Sec'y, Dept. of Veterans Affairs*, 918 F.2d 1073, 1078 (2d Cir. 1990)(ADEA). For federal sector employees, this requires an aggrieved employee to initiate contact with an agency EEO counselor within 45 days of the alleged discriminatory act, or, in the case of personnel action, within 45 days of the effective date of the action. *See* 29 C.F.R. § 1614.105(a)(1). Unless the employee opts for a longer counseling period or chooses an alternative dispute resolution procedure, the EEO counselor must, within 30 days of the employee's initial contact, conduct a final interview with the employee and, if the matter has not been resolved, notify the employee in writing of the right to file a discrimination complaint with the agency within 15 days of receipt of the notice. *See id.* at § 1614.105(d). If the employee wishes to file a complaint, it must be commenced within this 15-day period. *See id.* at § 1614.106(b). Upon receipt of the dismissal, final action, or decision of the agency, the employee may either appeal to the EEOC within 30 days, *see id.* at § 1614.402(a), or commence a civil action in federal district court within 90 days, *see id.* at § 1614.407(a).

Here, Ayers complains of numerous different alleged acts of

15

discrimination that occurred from March 2001 to March 2004.
While Ayers is not specific in her complaint about the alleged
acts of which she complains, she appears to claim that the
following actions were discriminatory: (1) reassigning her from
her position as limited-duty Level 4 Data Clerk in the expedited
services office to a position as a Level 4 Automated Mark Up
Clerk in the CFU in March 2001; (2) directing Ayers, on April 16,
2001, to stop working pending receipt of medical documentation to
determine the level of work that she could perform; (3) refusing
to permit Ayers to return to work on August 15, 2001 because her
medical documentation was insufficient; (4) directing Ayers to go
home after showing up for work on September 5, 2001; (5) denying
her request for a light duty assignment on February 5, 2003; and
(6) directing Ayers to stop working on December 3, 2003.
Additionally, Ayers apparently claims that the assault she
allegedly suffered at the hands of Annechino on March 12, 2004
was part of the hostile work environment that the USPS permitted.
She also claims that these discriminatory acts were done in
retaliation for the numerous complaints she had previously filed
against the USPS.

Ayers initiated contact with an EEO counselor on February
26, 2004. *See* Compl. at attachment 2 (Information for Pre-
Complaint Counseling).  Thus, for her request for EEO counseling
to be timely, the complained of actions of the USPS must have

16

occurred within the 45-day time period before that date, or, after January 12, 2004.  All of the alleged actions of which Ayers complains, however, with the exception of the alleged assault by Annechino, occurred prior to January 12, 2004.  While Plaintiff does not raise this argument in response to the USPS's motion, in her complaint and in the Information for Pre-Complaint Counseling form attached to the complaint, Ayers alleges that the acts of the USPS constitute a "continuing violation."  *See id.*

"The EEOC charging period is triggered when a discrete unlawful practice takes place" and, when an employer engages in a series of such unlawful actions, "a timely EEOC charge must be filed with respect to each discrete violation."  *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, No. 05-1074, slip op. at 8, 20 (U.S. May 29, 2007).  The continuing violation doctrine, however, states that, if a "plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone."  *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993).  The Court in *Lambert* explained that this exception applies where specific discriminatory policies or mechanisms are involved, such as discriminatory employment tests or seniority lists.  *See id*.  It expressly noted, however, that "multiple incidents of discrimination, even similar ones, that are not the

result of a discriminatory policy or mechanism do not amount to a
continuing violation."  *Id*.  In *Fitzgerald v. Henderson*, the
Second Circuit further explained the application of the
continuing violation doctrine in employment discrimination cases,
stating, "[E]ven where there is no formal policy, the continuing
violation theory may be used where there have been specific and
related instances of discrimination, and the employer has
permitted them to continue unremedied for so long that its
inaction may reasonably be viewed as tantamount to a policy or
practice of tolerating such discrimination."  251 F.3d 345, 362
(2d Cir. 2001).

Here, Plaintiff cannot rely on the continuing violation
doctrine because none of the discrete incidents of discrimination
of which she complains occurred within the 45 days preceding her
request for EEO counseling.  The record is devoid of any evidence
of misconduct that took place during this 45-day period.  Thus,
there is not one incident from this time that the Court could
reasonably conclude was taken pursuant to a policy or practice of
discrimination that served as the basis for the earlier alleged
incidents so as to render Plaintiff's request for EEO counseling
timely as to these earlier incidents.  Moreover, even if there
was a discriminatory act that occurred during this time period,
the previous alleged incidents, which amount to alleged denials
of Ayers's request for disability accommodations, are not

continuing violations.  It has been held that each alleged failure to accommodate an employee's disability is a discrete act of discrimination that triggers the EEOC charging period.  *See Elmenayer v. ABF Freight System, Inc.*, 318 F.3d 130, 134-35 n(2d Cir. 2003)(holding that "an employer's rejection of an employee's proposed accommodation for religious practices does not give rise to a continuing violation"); *Fol v. City of New York*, No. 01 Civ. 1115, 2003 WL 21556938, at *5 (S.D.N.Y. July 9, 2003)(applying *Elmenayer* and holding that each alleged failure to accommodate disability is a discrete act).

    In order to get around her time-bar problem, Ayers seems to argue that all of the specific incidents set forth in the record were part of an ongoing hostile work environment that continued up to the point of her request for EEO counseling and beyond and that, therefore, her initiation of EEO counseling procedures was timely under the continuing violation doctrine.  In *Nat'l Railroad Passenger Corp. v. Morgan*, the Supreme Court explained the difference between hostile work environment claims and discrete acts, stating that hostile environment claims involve repeated acts and that, therefore, the unlawful employment practice cannot be said to occur on any particular day.  536 U.S. 101, 115 (2002).  Because of the nature of such claims, the Court held that "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the

hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.  In this case, there is no evidence of any act taken during the 45 days before Ayers contacted the EEO counselor that was part of the alleged hostile environment.  In fact, Ayers testified at her deposition that after she began working on December 3, 2003, she no longer had any problems.  *See* Ayers Tr. at 315-18.  Thus, Ayers cannot rely on her hostile work environment claim to pull the pre-January 12, 2004 incidents of which she complains into the 45-day charging period.

Even assuming that Ayers had timely sought EEO counseling, her claims under Title VII, the ADEA, and the Rehabilitation Act, even those based on the alleged March 12, 2004 assault, are time-barred because she did not timely file her EEO complaint. As set forth above, pursuant to 29 C.F.R. § 1614.106(b), an EEO complaint must be filed within 15 days of receipt of the notice of the right to file a formal complaint.  Here, Ayers's notice of right to file a complaint was delivered to her on August 25, 2004.  *See* Pantoja Decl. at Ex. 5 (Record of Delivery).  Ayers did not file her complaint until on or after November 26, 2004 – well beyond the 15-day limit.  *See* Compl. at attachment 3. Accordingly, Ayers's claims are time-barred and should, therefore, be dismissed.  *See Belgrave v. Pena*, 254 F.3d 384 (2d Cir. 2001).

Ayers does not dispute that she failed to timely file her complaint. She instead argues that she was unable to "meet deadlines" because the USPS "forced [her] into [a] backlog situation with grievances, EEO complaints, [and] Labor Board Charges." Opposition at 15, ¶ 15. While the time period within which one must file an EEO complaint is subject to equitable tolling, Ayers cannot establish that such tolling should apply. "[E]quitable tolling is only appropriate 'in [] rare and exceptional circumstance[s],' . . . in which a party is 'prevented in some extraordinary way from exercising his rights.'" *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003)(internal citations omitted) (alterations in original). "When determining whether equitable tolling is applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine (1) has acted with reasonable diligence during the time period she seeks to have tolled, and (2) has proved that the circumstances are so extraordinary that the doctrine should apply." *Id.* (internal quotation marks and citation omitted).

In the instant case, Ayers clearly failed to act with reasonable diligence. She did not file her formal complaint until three months after her receipt of the notice of right to file a complaint. Moreover, the record reveals that Ayers has an extensive history of filing EEO complaints and, thus, is fully

aware of the filing requirements.  *See* Pantoja Decl. at Ex. 2.

Her unsupported and conclusory assertion that the USPS "forced

[her] into [a] backlog situation" cannot justify her failure to

comply with the deadlines for filing.  Finally, there is no

evidence of extraordinary circumstances to justify application of

equitable tolling.  Accordingly, I respectfully recommend that

your Honor dismiss Ayer's claims under Title VII, the ADEA, and

the Rehabilitation Act as time-barred.

**III.      Jurisdiction under the ADA**

To the extent Ayers asserts disability discrimination claims

under the ADA, such claims must be dismissed because the USPS is

not an employer within the meaning of the ADA.  *See* 42 U.S.C.

§ 12111(2) & (5)(B)(i).  The Rehabilitation Act provides federal

employees with the only basis for raising disability claims

against the federal government.  *See Rivera v. Heyman*, 157 F.3d

101, 103 (2d Cir. 1998) ("As a federal employee, Rivera has no

remedy for employment discrimination under the ADA . . . .  His

sole claim for discrimination on the basis of disability is under

the Rehabilitation Act, if anywhere.").  Accordingly, Ayers's ADA

claim is without merit and should be dismissed.

### CONCLUSION

For the foregoing reasons, I respectfully recommend that

your Honor grant the USPS's motion and dismiss Ayers's complaint.

**NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Rule 72(b), Fed. R. Civ .P., the parties shall have ten (10) days, plus an additional three (3) days, pursuant to Rule 6(e), Fed. R. Civ. P., or a total of thirteen (13) working days, (*see* Rule 6(a), Fed. R. Civ. P.), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Charles L. Brieant, at the United States Courthouse, 300 Quarropas Street, Room 275, White Plains, New York, 10601, and to the chambers of the undersigned at Room 434, 300 Quarropas Street, White Plains, New York 10601.

Failure to file timely objections to the Report and Recommendation will preclude later appellate review of any order to judgment that will be entered by Judge Brieant.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), cert. denied 113 S. Ct. 825 (1992); *Small v. Secretary of H.H.S.*, 892 F.2d 15,16 (2d Cir. 1989) (*per curiam*); *Wesolek v. Canadair, Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988).  Requests for extensions of time to file objections must be made to Judge

Brieant and should <u>not</u> be made to the undersigned.

Dated: June    , 2007
White Plains, New York

_____
                              Mark D. Fox
          UNITED STATES MAGISTRATE JUDGE


Copies of the foregoing Report and Recommendation have been
sent to the following:

The Honorable Charles L. Brieant, U.S.D.J.

Ms. Joyce B. Ayers
30 Park Avenue, 5F
Mount Vernon, New York 10550

Mr. Joseph Pantoja, Esq.
Assistant United States Attorney
U.S. Attorney's Office
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

Brieant and should <u>not</u> be made to the undersigned.

Dated: June *1* , 2007
White Plains, New York

_____
Mark D. Fox
UNITED STATES MAGISTRATE JUDGE


Copies of the foregoing Report and Recommendation have been
sent to the following:

The Honorable Charles L. Brieant, U.S.D.J.

Ms. Joyce B. Ayers
30 Park Avenue, 5F
Mount Vernon, New York 10550

Mr. Joseph Pantoja, Esq.
Assistant United States Attorney
U.S. Attorney's Office
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007